# United States Court of Appeals
## For the First Circuit

No. 22-1913

RHODE ISLAND TRUCK CENTER, LLC,

Plaintiff, Appellant,

v.

DAIMLER TRUCKS NORTH AMERICA, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Edward J. Sackman, with whom Hilary Holmes Rheaume and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief, for appellant.

Nathan D. Imfeld, with whom Roberta F. Howell and Foley & Lardner LLP were on brief, for appellee.

February 9, 2024

BARRON, **Chief Judge**. This appeal concerns a Rhode Island truck dealer's challenge to a grant of summary judgment to an out-of-state truck manufacturer on two of the dealer's claims. The claims allege that a Rhode Island state agency erred in ruling that it lacked jurisdiction to grant relief to the dealer for the manufacturer's alleged violations of a Rhode Island law that regulates motor-vehicle dealers and manufacturers. The agency based its ruling on its determination that it "lacks the authority to apply the provisions of the Rhode Island dealer law in an extraterritorial manner and therefore cannot prohibit [the manufacturer] from establishing or moving a dealership outside the boundaries of the state." The U.S. District Court for the District of Rhode Island granted summary judgment to the manufacturer on the dealer's claims. R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC, 642 F. Supp. 3d 218, 225 (D.R.I. 2022).

We begin by addressing a question of first impression concerning our subject-matter jurisdiction. We then conclude that, to resolve the dealer's challenge to the summary-judgment ruling on one of the dealer's two claims that are on appeal, we must certify to the Rhode Island Supreme Court a question about the Rhode Island dealer law's extraterritorial application. However, we affirm the District Court's grant of summary judgment on the other claim.

The Rhode Island truck dealer is Rhode Island Truck Center, LLC ("RITC"). The out-of-state manufacturer is Daimler Trucks North America, LLC ("Daimler"), which is based in Oregon. The state agency is the Rhode Island Motor Vehicle Dealers License and Hearing Board ("Board"). The underlying Rhode Island law is Rhode Island General Laws sections 31-5.1-1 to 31-5.1-21 ("Dealer Law").

This appeal concerns two of the claims in RITC's suit against Daimler. Those claims pertain to two portions of a "protest" that RITC brought to the Board in 2022 in which RITC alleged that Daimler had violated the Dealer Law.[1] See R.I. Gen. Laws § 31-5.1-4.2(a) (providing protest procedures). After describing those portions of the protest -- and the Board's ruling dismissing them -- we will trace the procedural developments that led to this appeal.

**A.**

RITC alleged in the first portion of the protest relevant to this appeal that Daimler violated the Dealer Law in connection with a franchise that RITC had with Daimler to sell Daimler's

---

[1] The portion of that protest that is not at issue in this appeal alleged that Daimler had acted arbitrarily, in bad faith, or unconscionably in relation to the Freightliner line of trucks, such as through Daimler's prior assurance to RITC that it would not establish a new Freightliner franchise with another dealer inside RITC's "relevant market area."

Freightliner line of trucks. For ease of reference, we shall refer to this portion of the protest (and the underlying allegations of Daimler's wrongdoing) as the "Freightliner Claim."

The Freightliner Claim is premised in part on the provision in § 31-5.1-4.2(a) of the Dealer Law that states that, when a "manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealership . . . within or into a relevant market area where the same line or make is then represented," the manufacturer must give notice of that intention to "each new motor vehicle dealer in the same line or make in the relevant market area." Id. "Relevant market area" is defined elsewhere in the Dealer Law as "the area within a radius of twenty (20) miles around an existing dealer or the area of responsibility defined in the franchise, whichever is greater." Id. § 31-5.1-1(13).

RITC alleged in this part of the Freightliner Claim that, although Daimler had already given RITC a franchise to sell Daimler's Freightliner trucks, Daimler "never provided RITC with notice that it intended to appoint a Freightliner dealership within RITC's ['area of responsibility' and thus its 'relevant market area']." That Freightliner dealership was Advantage Truck Group Raynham ("ATG Raynham"). RITC then went on to allege that, "[a]s a result, [Daimler] failed to comply with the statutory notice requirements under R.I. Gen. Laws § 31-5.1-4.2(a)[.]"

RITC alleged in support of this latter allegation that ATG Raynham was operating in RITC's "relevant market area" even though ATG Raynham was doing business in Bristol County, Massachusetts -- and so beyond the borders of Rhode Island. That was so, RITC alleged, because ATG Raynham was operating inside RITC's "area of responsibility," which RITC alleged "included Bristol County in the Commonwealth of Massachusetts."

RITC also alleged in its Freightliner Claim that Daimler violated § 31-5.1-4.2(a) in another way by establishing the ATG Raynham dealership. Here, RITC alleged that the violation resulted because Daimler did not have "good cause" to establish that dealership. RITC relied for this allegation on the parts of § 31-5.1-4.2(a) that state that, "[w]ithin thirty (30) days of receiving notice" of the manufacturer's "intention to establish an additional dealership," "any affected new motor vehicle dealership may file with the department a protest to the establishing . . . of the new motor vehicle dealership" and that, "[w]hen a protest is filed, the [Department of Revenue] shall inform the manufacturer that . . . the manufacturer shall not establish . . . the proposed new motor vehicle dealership . . . until the department has held a hearing, nor until the department has determined that there is

<u>good cause</u> for not permitting the new motor vehicle dealership."

<u>Id.</u> § 31-5.1-4.2(a) (emphasis added).[2]

RITC alleged that Daimler did not have the requisite "good cause" in part because RITC "meets or exceeds [Daimler's] standards for customer care, sales, service facilities, supply of parts and qualified service personnel" and "the market of Bristol County, Massachusetts does not and cannot support two (2) Freightliner dealerships, nor has [Daimler] ever represented to RITC that there was a need for a second Freightliner dealership within Bristol County, Massachusetts." RITC further alleged that

---

[2] The Dealer Law provides that, at the hearing, the Board must determine whether there is "good cause" for establishing the new dealership based on factors including, but not limited, to the following:

- "Whether the new motor vehicle dealers of the same line or make in that relevant market area are providing adequate consumer care for the motor vehicles of the line or make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel[.]" R.I. Gen. Laws § 31-5.1-4.2(b)(2).
- "Whether there is reasonable evidence that after the granting of the new motor vehicle dealership, that the market would support all of the dealerships of that line or make in the relevant market area[.]" <u>Id.</u> § 31-5.1-4.2(b)(3).
- "Whether the manufacturer is motivated principally by good faith to establish an additional or new motor vehicle dealer and not by non-economic considerations[.]" <u>Id.</u> § 31-5.1-4.2(b)(6).

The manufacturer bears the burden of proving that there is "good cause" for establishing the new dealership. <u>Id.</u> § 31-5.1-4.2(d).

- 6 -

Daimler lacked the requisite "good cause" because in establishing the dealership Daimler "was principally motivated by non-economic considerations when it appointed [ATG Raynham] as a Freightliner dealer within RITC's ['area of responsibility' and thus 'relevant market area']."

RITC requested various forms of relief from the Board in connection with the Freightliner Claim. Specifically, RITC sought: (1) a "finding and ruling that [Daimler] violated R.I. Gen. Laws § 31-5.1-4.2(a) by adding a Freightliner franchise to RITC's relevant market area without providing the requisite statutory notice and allowing RITC to protest"; (2) a "finding and ruling that [Daimler's] violation of R.I. Gen. Laws § 31-5.1-4.2(a) must be remedied by [Daimler] removing the new and unauthorized Freightliner franchise within RITC's relevant market area"; and (3) civil damages, costs, and attorneys' fees.

RITC alleged in the second portion of the protest relevant to this appeal that Daimler violated the Dealer Law in connection with a franchise that RITC unsuccessfully sought from Daimler to sell Daimler's Western Star line of trucks. This portion of the protest alleged that Daimler violated § 31-5.1-4(a) of the Dealer Law, which prohibits "any manufacturer or motor vehicle dealer" from "engag[ing] in any action that is arbitrary, in bad faith, or unconscionable and that causes damage to any of the parties involved or to the public." R.I. Gen. Laws

§ 31-5.1-4(a). We shall refer to this portion of RITC's protest as its "Western Star Claim."

In the Western Star Claim, RITC alleged that Daimler had "denied RITC's application for a Western Star franchise in bad faith because it already intended to grant [ATG Raynham] -- not RITC -- a Western Star franchise." RITC further alleged in support of its allegation of Daimler's violation that Daimler had denied RITC's application for that franchise on the basis that "RITC allegedly did not have adequate service capacity . . . and . . . needed to move to a new . . . location before it would be granted a Western Star franchise," that RITC then "started the process to move . . . to obtain a Western Star franchise," and that Daimler later told RITC that it "intended to appoint a Western Star dealer in Bristol County, Massachusetts[,]" with ATG Raynham. For relief, RITC sought a "finding and ruling that [Daimler's] conduct has been arbitrary, in bad faith and unconscionable," a "finding and ruling that [Daimler] unreasonably prevented RITC from obtaining a Western Star dealership," and an award of civil damages, costs, and attorneys' fees.

The Board dismissed both the Freightliner Claim and the Western Star Claim. The Board began its analysis by reasoning as follows:

> The Commerce Clause of the United States
> Constitution precludes the application of a
> state statute to commerce that takes place

wholly outside the State's borders, whether or not the commerce has effects within the State. Edgar v. MITE Corp., 457 U.S. 624, 642-643 (1982). A state statute that "may adversely affect interstate commerce by subjecting activities to inconsistent regulations" may be considered invalid under the Commerce Clause. Morley-Murphy Co. [v]. Zenith Elecs. Corp., 142 F.3d 373, 379 (7th Cir. 1998) (citing CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88 (1987)). Any attempt to apply Rhode Island's dealership, distribution and franchise law in an extraterritorial manner would certainly run afoul of the Commerce Clause.

The Board then went on to address two federal court precedents concerning the Dealer Law, one of which was decided by our Court:

> The issue has previously been addressed by the federal courts in two cases which are dispositive of the issue before the Board. In Fireside Nissan, Inc. v. Fanning, 30 F.3d 206 (1st Cir. 1994), a Massachusetts dealer ("Fireside") sought to protest the establishment of a new dealership in Rhode Island, but was barred from doing so on the grounds that out—of—state dealers lacked standing to protest under the Dealer Law. Id. [a]t 209-10. The Massachusetts dealer sued the Rhode Island Department of Transportation ("DOT") seeking a declaration that its exclusion from the protest hearings violated the law. Id. [a]t 210-11.
>
> The United States District Court for the District of Rhode Island denied Fireside's requested relief and that ruling was affirmed by the First Circuit Court of Appeals. The First Circuit agreed with the District Court's findings that the Dealer Law "targeted only activities which occur within the state of Rhode Island performed by businesses seeking or holding Rhode Island dealership licenses.

- 9 -

* * * [T]he Rhode Island legislature did not intend for the statute to apply to, or for the benefit of, out-of-state dealers such as Fireside." Id. [a]t 211. The First Circuit found that only Rhode Island dealers can be in a "relevant market area" for purposes of [the] dealer law. Id. [a]t 213 (emphasis added). The Court concluded that the DOT had properly applied the statute to exclude non-Rhode Island dealers from protest hearings. The First Circuit also found that the DOT's interpretation of the Dealer Law did not violate any constitutional rights of Fireside.

The factual scenario of Fireside can fairly be described as the inverse of the situation presently before the Board; an out-of—state dealer protesting the establishment of a new in-state dealership. Several years after Fireside, however, the District of Rhode Island was presented with an opportunity to apply Fireside's reasoning to facts which much more closely parallel the instant case, in County Motors, Inc. v. GMC, 2001 WL 34136693. In County Motors, a Massachusetts General Motors ("GM") dealer sought and received approval from GM to relocate its dealership from one part of Attleboro, Massachusetts to another. The relocation placed the dealership closer to another GM dealership which was located in Rhode Island. The Rhode Island dealer filed a protest with the Board under R.I.G.L. § 31—5.1-4.2, claiming that the new location of the Massachusetts dealership was within its relevant market area as that term is defined in the statute. This Board dismissed the protest on the grounds that it lacked jurisdiction over the relocation of an automobile dealership in Massachusetts.

Rather than appeal the Board's decision, the Rhode Island dealer sued GM in federal court in an effort to prevent the relocation. Relying heavily on Fireside, the County Motors court found R.I.G.L. § 31-5.1-4.2 entirely "inapplicable" to the relocation of a Massachusetts dealership. Id. at 2. To allow

- 10 -

a Rhode Island dealer to protest the relocation of a Massachusetts dealership under that statute would have been clearly "inequitable and contrary to the reasoning of Fireside Nissan." Id. [a]t 3. The Court went even further, holding that the Rhode Island dealer "would have no claim under any portion of § 31-5.1" in regards to the relocation of a Massachusetts dealership. Id.

The Board wound up its analysis as follows:

> The Fireside Nissan and County Motors cases are controlling. This Board lacks the authority to apply the provisions of the Rhode Island dealer law in an extraterritorial manner and therefore cannot prohibit Respondent from establishing or moving a dealership outside the boundaries of this state.
>
> After careful review of all the reliable, probative and substantial evidence presented by both parties to this complaint and based on the reasonable inferences derived from them, and for the reasons outlined above, it is hereby ORDERED that:
>
> 1. The protest filed by Rhode Island Truck Center is hereby dismissed due to lack of jurisdiction.

**B.**

RITC initially challenged the Board's ruling in Rhode Island Superior Court, naming Daimler (but not the Board) as the defendant. RITC did so pursuant to the Rhode Island Administrative Procedure Act, which permits parties to a Board proceeding to obtain judicial review in the Rhode Island courts of the resulting Board decision. See R.I. Gen. Laws § 42-35-15; see also R.I. Gen. Laws § 31-5.1-4.2(c) ("Any parties to a hearing by the department

- 11 -

concerning the establishing or relocating of a new motor vehicle dealership or adding an additional location for an existing new motor vehicle dealership shall have a right to a review of the decision in a court of competent jurisdiction.").

RITC's state-court complaint alleged that the "Board's dismissal of the Protest has prejudiced the substantial rights of RITC and was improper." It alleged that this was so because:

> a. The Protest did not require the Dealer Board to apply the provisions of the Rhode Island dealer law in an extraterritorial manner;
>
> b. Assuming arguendo that the Protest required the Dealer Board to apply the provisions of the Rhode Island dealer law in an extraterritorial manner, the Dealer Board had jurisdiction to do so; and
>
> c. The Dealer Board's dismissal was improper, even if it was correct on the issue of extraterritoriality, because there was no dispute that the Dealer Board had jurisdiction to adjudicate RITC's remaining claims: (i) [Daimler] failed to comply with the statutory notice provisions set forth in § 31-5.1-4.2(a); (ii) [Daimler] denied RITC's application for a Western Star franchise in bad faith; and/or (iii) [Daimler] acted in a manner that was arbitrary, in bad faith, and/or unconscionable. The Dealer Board's decision failed to provide any analysis in support of its dismissal of these claims.

The complaint went on to allege that the "Board's decision should be reversed because it is: a. in violation of constitutional or statutory provisions; b. made upon unlawful procedure; c. affected by other error of law; and/or d. arbitrary,

capricious or characterized by an abuse of discretion, or a clearly unwarranted exercise of discretion."  RITC requested that the Superior Court reverse the Board's decision, remand the matter to the Board "with instructions to adjudicate RITC's claims as set forth in the Protest," award RITC its "costs, including reasonable attorneys' fees, of prosecuting this appeal," and award "such other relief as this Honorable Court deems just."

## C.

Daimler removed RITC's state-court case to the United States District Court for the District of Rhode Island.  Daimler's notice of removal stated that removal was proper under 28 U.S.C. § 1441(a) because there was diversity jurisdiction under 28 U.S.C. § 1332, given that RITC was based in Rhode Island and Daimler was not.  Daimler then moved to dismiss RITC's complaint against Daimler pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted.  RITC opposed the motion.  The District Court treated the parties' filings as cross-motions for summary judgment and then granted summary judgment to Daimler and denied summary judgment to RITC on three grounds.  R.I. Truck Ctr., 642 F. Supp. 3d at 221-25.

The District Court first concluded that "[a]djudicating this [d]ispute [w]ould [r]equire the [e]xtraterritorial [a]pplication of Rhode Island [l]aw" because the interactions at issue "directly affected out-of-state conduct (the sale of certain

truck brands in Bristol County, MA)" and "would have the effect of extraterritorially regulating conduct in Massachusetts." Id. at 222 (emphasis in original). In the course of setting forth this conclusion, the District Court stated, however, that the Dealer Law's "protections only go as far as the state's geographic borders" and that "just because the statute's language is not limited to the state's geographic borders does not necessarily mean that it should be read expansively." Id. It then relied on our decision in Fireside Nissan in asserting that the Dealer Law's "primary objectives are not accomplished through the regulation of the dealerships in Massachusetts." Id.

The District Court did not confine its analysis, however, to the scope of the Dealer Law itself. It went on to address the federal constitutional limits imposed by the Dormant Commerce Clause on the extraterritorial application of the Dealer Law, noting that "even if the statute did explicitly cover conduct outside the state of Rhode Island, as RITC suggests, the statute would still be subject to the limits imposed by the Commerce Clause." Id.

In that regard, the District Court concluded that the Board "[l]acks [a]uthority to [a]pply Rhode Island [l]aw [e]xtraterritorially," id. at 223, on the ground that "the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a

- 14 -

transaction in another," id. (quoting Healy v. Beer Inst., Inc., 491 U.S. 324, 337 (1989)), and that, "[u]nder RITC's position, Daimler would be required to answer to the Board (the equivalent of seeking regulatory approval from a Rhode Island regulator) for its decisions to grant or not grant franchises in Massachusetts," id. Indeed, the District Court continued, "[e]very time Daimler wanted to interact with a dealer in Rhode Island, it would be required to consult and act in accordance with Rhode Island law, regardless of where the underlying conduct at issue would occur," which, according to the District Court, would "violate[] states' inherent sovereignty to regulate conduct within their borders." Id.

Finally, the District Court concluded that "RITC [p]ossesses [n]o [r]emaining [c]laims that the [agency] [c]an [c]onstitutionally [a]djudicate." Id. at 224. Having already concluded that RITC's claims to the Board failed on Dormant Commerce Clause grounds, the District Court explained that "there would not even be a proper occasion to rule on the merits of the statutory claims. Any statutory right that RITC might claim to have found in Rhode Island's laws would thus run afoul of the Commerce Clause." Id. And, in response to RITC's argument that the Board "could award damages based on [Daimler's] violation of the [Dealer Law], which would have no bearing on the operations of the competing dealership in Massachusetts," id. (alterations in

original), the District Court further concluded that the argument failed on Dormant Commerce Clause grounds, too, because "such an imposition of damages or a fine . . . would influence Daimler's conduct in Massachusetts" and would "have the effect of regulating Daimler's business in Massachusetts," id. The District Court reasoned that, "before Daimler could make decisions regarding a franchise in Massachusetts, it would first have to check if a Rhode Island dealer would be affected, and if so, comply with Rhode Island law to avoid a monetary penalty." Id. at 224-25.

RITC timely appealed.

**II.**

We begin with a question that concerns our subject-matter jurisdiction. See One & Ken Valley Hous. Grp. v. Me. State Hous. Auth., 716 F.3d 218, 224 (1st Cir. 2013) (explaining that, "[a]lthough none of the parties raise the issue on appeal, we have an obligation to inquire into our subject-matter jurisdiction sua sponte"). It arises because of our decision in Armistead v. C & M Transport, Inc., 49 F.3d 43 (1st Cir. 1995).

Armistead held that there was no federal court subject-matter jurisdiction in that case because the claims at issue sought to enforce a state administrative agency's ruling pursuant to state law. Id. at 46. Even though there was complete diversity of the parties, the court explained, "federal district courts sitting in diversity jurisdiction do not have appellate

- 16 -

power, nor the right[,] to exercise supplementary equitable control over original proceedings in the state's administrative tribunals." Id. Armistead further explained that the "limited supplementary and appellate authority exercised by the Maine courts over Commission proceedings finds no analog in federal diversity jurisdiction," id., and that the requested appellate enforcement of state agency action was not "a civil action within the cognizance of the original jurisdiction of the federal court," id. at 48 (emphasis added) (quoting 1A James Wm. Moore et al., Moore's Federal Practice ¶ 0.167[6] (2d ed. Supp. 1994)).

Because the claims that are at issue in this case are themselves brought pursuant to a state law and seek the review of a state administrative ruling, we asked the parties to provide supplemental briefing on the question of whether we lack subject-matter jurisdiction under Armistead. We conclude that the parties are right, however, that we do have jurisdiction, given the post-Armistead ruling by the Supreme Court of the United States in City of Chicago v. International College of Surgeons, 522 U.S. 156 (1997).

**A.**

City of Chicago, like Armistead, was a case that had been removed to federal court, involved claims that had been brought pursuant to a state law, and concerned a nonfederal administrative agency's ruling. See City of Chicago, 522 U.S. at

- 17 -

160-61; Armistead, 49 F.3d at 44-46.  But, unlike Armistead, City of Chicago held that there was federal subject-matter jurisdiction over the claims.

The Court emphasized that, although some of the claims at issue sought review of the relevant agency ruling on purely state-law grounds, see Int'l Coll. of Surgeons v. City of Chicago, Nos. 91-C-1587, 91-C-5564, 1995 WL 9243, at *2 (N.D. Ill. Jan. 9, 1995), others of the claims sought such review on the ground that the agency had erred both because (1) certain local ordinances on which the agency had relied for its ruling, "on their face and as applied," violated various provisions of the U.S. Constitution; and (2) "the manner in which the [local administrative agency] conducted its administrative proceedings violated [the plaintiff's] rights to due process and equal protection[,]" City of Chicago, 522 U.S. at 160.  The Court explained that the presence of those latter kinds of claims was jurisdictionally significant because they were encompassed by 28 U.S.C. § 1331, which gives federal courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." See City of Chicago, 522 U.S. at 164; 28 U.S.C. § 1331.  The Court reasoned that those "federal constitutional claims, which turn exclusively on federal law, unquestionably fit within th[e] rule" that the case "might still 'arise under' the laws of the United States if a well-pleaded complaint established that [the party's]

- 18 -

right to relief under state law requires resolution of a substantial question of federal law." City of Chicago, 522 U.S. at 164 (quoting Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 13 (1983)).

The Court went on to conclude, moreover, that because § 1331 encompassed "[t]hose federal claims," id. at 166, they were properly removed under 28 U.S.C. § 1441(a), which provides in relevant part that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district . . . embracing the place where such action is pending," 28 U.S.C. § 1441(a). The Court explained in that regard that the federal claims in the case "suffice[d] to make the actions 'civil actions' within the 'original jurisdiction' of the district courts for purposes of removal." City of Chicago, 522 U.S. at 166 (quoting 28 U.S.C. § 1441(a)).

Finally, the Court held that, because there was subject-matter jurisdiction over the federal claims, there also was subject-matter jurisdiction under 28 U.S.C. § 1367(a) over the purely state-law claims. See id. at 167. That statute provides in relevant part:

> [I]n any civil action of which the district
> courts have original jurisdiction, the
> district courts shall have supplemental

> jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The Court determined there was such supplemental jurisdiction because of the relationship between the state claims and the federal claims. City of Chicago, 522 U.S. at 167; see also Halmekangas v. State Farm Fire & Cas. Co., 603 F.3d 290, 293 (5th Cir. 2010) (explaining that, under § 1367 and § 1441, "if a plaintiff . . . alleg[es] both federal and state claims arising out of the same controversy, the entire action may be removed to federal court" because, "first, a party will use § 1441 to remove the civil action over which federal courts have original jurisdiction; and second, the party will invoke § 1367 to allow the state claims to piggyback the federal claims").

**B.**

This review reveals that if at least one of the claims here is not materially different from the federal claims in City of Chicago, then we would have subject-matter jurisdiction over that claim under 28 U.S.C. §§ 1331 and 1441(a). And, in that event, it would further follow from City of Chicago that we would have supplemental jurisdiction under § 1367 over the other RITC claim insofar as the relationship between the two RITC claims is materially no different from the relationship between the state and federal claims in City of Chicago. We thus must first

determine whether at least one of RITC's two claims is materially the same -- for jurisdictional purposes -- as the federal claims in City of Chicago.

To make that determination, we begin and end our analysis with the claim in which RITC challenges the Board's dismissal of the Freightliner Claim, as we conclude that this claim is, in all respects relevant to the jurisdictional inquiry, no different from the federal claims in City of Chicago. With that conclusion in place, we then go on to explain why we have supplemental jurisdiction over the claim in which RITC challenges the Board's dismissal of the Western Star Claim.

**1.**

RITC does not allege in its claim pertaining to the Board's dismissal of the Freightliner Claim that the Board violated federal law, constitutional or otherwise. RITC alleges instead that the Board made an erroneous determination of federal constitutional law in ruling as it did. Nonetheless, we conclude that, reviewing de novo, see Law Offs. of David Efron v. Matthews & Fullmer L. Firm, 782 F.3d 46, 51 (1st Cir. 2015), the claim not only arises under federal law within the meaning of 28 U.S.C. § 1331 but also was properly removed on that basis under 28 U.S.C. § 1441(a).[3]

---

[3] Daimler's notice of removal asserted only diversity jurisdiction, but that does not necessarily preclude there being

- 21 -

subject-matter jurisdiction on a different basis. See Hayday Farms, Inc. v. FeeDx Holdings, Inc., 55 F.4th 1232, 1238-39 (9th Cir. 2022) (explaining that, although the "parties asserted diversity jurisdiction below and on appeal," "[the court] may examine whether another basis for jurisdiction exists" and finding that there was federal-question jurisdiction notwithstanding the parties' failure to assert it until after the court ordered supplemental briefing on the issue, for a "cause of action 'arises under' federal law for jurisdictional purposes when the plaintiff's well-pleaded complaint raises federal law issues, even if the federal claim is not explicitly invoked"); see also Agyin v. Razmzan, 986 F.3d 168, 181 & n.14 (2d Cir. 2021) (explaining that "the same liberal rules employed in testing the sufficiency of a pleading should apply to appraise the sufficiency of a defendant's notice of removal[,]" that "[i]t is enough if the court is provided the facts from which its jurisdiction can be determined," and that, "[f]or that reason, a party's failure to make reference to an applicable removal provision in a removal petition is not fatal but instead is merely a technical defect" (cleaned up)); cf. Eisler v. Stritzler, 535 F.2d 148, 152 n.3 (1st Cir. 1976) (explaining that if "we conclude that the district court had federal question jurisdiction over at least portions of this lawsuit, it would be a baseless formality to require plaintiffs to amend their complaint, and we consider plaintiffs' complaint to be amended as alleging jurisdiction under . . . [the federal-question-jurisdiction statute,] 28 U.S.C. [§] 1331"); 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3733 (rev. 4th ed. 2020) ("In most circumstances, . . . defendants may not add completely new grounds for removal or furnish missing allegations, even if the court rejects the first-proffered basis of removal, and the court will not, on its own motion, retain jurisdiction on the basis of a ground that is present but the defendants have not relied upon." (emphasis added)). But cf. City of Oakland v. BP PLC, 969 F.3d 895, 911 n.12 (9th Cir. 2020) ("The Energy Companies identified six alternate bases for subject-matter jurisdiction in their notices of removal. . . . On appeal, the Energy Companies identified admiralty jurisdiction, 28 U.S.C. § 1333, as a seventh alternate basis for jurisdiction. . . . [H]owever, the Energy Companies waived any argument related to admiralty jurisdiction by not invoking it in their notices of removal.").

Moreover, here, the allegations in the complaint and the notice of removal support there being federal-question jurisdiction, and the parties jointly ask us to retain jurisdiction on that basis. Cf. Gavin v. AT&T Corp., 464 F.3d 634, 640 (7th Cir. 2006) ("[T]he removal petition does not mention diversity;

- 22 -

In setting forth our reasons for so concluding, we focus chiefly on the Supreme Court's post-City of Chicago decision in Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308 (2005). There, the Court explained that a state-law claim gives rise to federal-question jurisdiction under § 1331 when it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Id. at 314.[4]

**a.**

Grable first requires RITC to show that the claim at issue "necessarily raise[s]" a federal issue. 545 U.S. at 314. RITC thus must show that it can prevail on the claim only if the stated federal issue -- in this case, the Dormant Commerce Clause

---

nor has either defendant asked us to retain jurisdiction on the basis of diversity."). We are thus not prevented from resting our subject-matter jurisdiction on a basis other than diversity jurisdiction.

[4] In setting forth this test, the Supreme Court in Grable noted that at least as early as 1921 the Court had "held [in Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 199 (1921)], in a somewhat generous statement of the scope of the doctrine, that a state-law claim could give rise to federal-question jurisdiction so long as it 'appears from the [complaint] that the right to relief depends upon the construction or application of [federal law].'" 545 U.S. at 312-13 (quoting Smith, 255 U.S. at 199). The Court in Grable then went on to acknowledge that this "statement has been subject to some trimming to fit earlier and later cases recognizing the vitality of the basic doctrine, but shying away from the expansive view that mere need to apply federal law in a state-law claim will suffice to open the 'arising under' door." Id. at 313.

issue -- is resolved. See Franchise Tax Bd. of Cal., 463 U.S. at 27-28 (describing embedded-federal-question jurisdiction in terms of whether "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law" (emphasis added)); Gunn v. Minton, 568 U.S. 251, 259 (2013) ("To prevail on his legal malpractice claim, [the plaintiff] must show that he would have prevailed in his federal patent infringement case . . . . That will necessarily require application of patent law to the facts of [the plaintiff's] case." (emphasis added)); Rhode Island v. Shell Oil Prods. Co., LLC, 35 F.4th 44, 57 (1st Cir. 2022) ("[T]he Energy Companies pinpoint no specific federal issue that must necessarily be decided for Rhode Island[, the plaintiff,] to win its case . . . ." (emphasis added)).

The Board concluded based on the Dormant Commerce Clause that it "lack[ed] the authority to apply provisions of the Rhode Island dealer law in an extraterritorial manner and therefore cannot prohibit [Daimler] from establishing or moving a dealership outside the boundaries of this state." To overturn that ruling, RITC seeks to show that the Board's Dormant Commerce Clause analysis was mistaken. Thus, "it is not logically possible for [RITC] to prevail on [its] cause of action without affirmatively answering the embedded question of . . . federal law," R.I. Fishermen's All., Inc. v. R.I. Dep't of Env't Mgmt., 585 F.3d 42, 49 (1st Cir. 2009), which in this case concerns a question about

- 24 -

the restrictions that the Dormant Commerce Clause imposes. Accordingly, the stated federal issue is "necessarily raise[d]." Grable, 545 U.S. at 314.[5]

**b.**

Grable's "actually disputed" requirement, id., is also met. RITC's claim that the Board erred in concluding that it lacked jurisdiction over the Freightliner Claim is dependent on its assertion about how the Dormant Commerce Clause issue must be resolved, and Daimler disputes RITC's position about the proper resolution of that issue. Thus, the federal-law issue in play is actually disputed.

**c.**

The third Grable requirement -- that the federal law issue must be "substantial," id. -- is met as well. "Substantiality demands that an embedded federal question be 'important to the federal system,' not just to the parties." AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp., 15 F.4th 551, 558 (1st Cir. 2021) (quoting Municipality of Mayagüez v. Corporación Para el Desarrollo del Oeste, Inc., 726 F.3d 8, 14 (1st Cir.

---

[5] In reaching this conclusion, we note that nothing in the record makes manifest that RITC could prevail on this claim on the ground that the Board's decision was wrong because, as a matter of state law, the Board was obligated by state law to adjudicate RITC's protest on its merits even if the Board believed that doing so would transgress the federal Constitution. Nor does either RITC or Daimler develop any argument based on Rhode Island law to that effect.

2013)).  The substantiality prong is satisfied, therefore, when "the outcome of the claim could turn on a new interpretation of a federal statute or regulation which will govern a large number of cases."  Municipality of Mayagüez, 726 F.3d at 14.  Moreover, "a case is more likely to be important to the federal system as a whole if it presents 'a nearly "pure issue of law . . . that could be settled once and for all"' rather than an issue that is 'fact-bound and situation-specific' and whose holding will more likely be limited to the facts of the case."  Id. (quoting Empire HealthChoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 700-01 (2006)).

We have explained -- albeit outside the Grable context -- that there is a "federal interest in enforcing the [D]ormant Commerce Clause" and that the "Supreme Court has recently reiterated that the [D]ormant Commerce Clause 'reflect[s] a "central concern of the Framers that was an immediate reason for calling the Constitutional Convention[.]"'"  Am. Trucking Ass'ns v. Alviti, 14 F.4th 76, 88 (1st Cir. 2021) (quoting Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2461 (2019)).  Grable itself explained, moreover, that "constitutional questions may be the more likely ones to reach the level of substantiality that can justify federal jurisdiction."  545 U.S. at 320 n.7 (citing Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 814 n.12 (1986)).  In addition, the stated federal issue presents a

"nearly pure issue of law" that "could be settled once and for all," <u>Tyngsboro Sports II Solar, LLC</u> v. <u>Nat'l Grid USA Serv. Co.</u>, 88 F.4th 58, 68 (1st Cir. 2023) (quotations omitted): Would the Dormant Commerce Clause be violated if, by enforcing the Dealer Law here, the Board were to "prohibit [a party] from establishing or moving a dealership outside the boundaries of" Rhode Island?

That is not to say the record makes plain that cases governed by our ruling on the constitutional issue here would "arise frequently." <u>Gunn</u>, 568 U.S. at 262. But that feature of the record does not necessarily preclude a finding that <u>Grable</u>'s "substantiality" prong is satisfied. <u>See</u> <u>R.I. Fishermen's All., Inc.</u>, 585 F.3d at 51 (finding the "substantiality" prong of <u>Grable</u> to be satisfied in a claim about the interpretation of federal law, notwithstanding that this Court did not address how many cases would be governed by a ruling on that issue). And we are persuaded by RITC's contention that the stated federal issue here does not arise in a case in which "the result would be limited to the parties . . . that had been before the state [agency]." <u>Gunn</u>, 568 U.S. at 263; <u>cf.</u> <u>Tyngsboro</u>, 88 F.4th at 68 ("[W]e fail to see how its resolution would affect a sufficiently large class of cases.").

At the very least, courts nationwide may be informed by the resolution of that issue in this case because, as RITC argues, such resolution could "apply by analogy to all cases where a franchisor appoints a new franchise within a franchisee's

territory that lies in another state."  Daimler also has pointed to a variety of cases around the nation in which the extraterritorial application of dealer-protection statutes has been at issue.  See, e.g., Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484 (4th Cir. 2007); BMW Stores, Inc. v. Peugeot Motors of Am., Inc., 860 F.2d 212 (6th Cir. 1988); Morley-Murphy Co., 142 F.3d 373.  We therefore conclude that Grable's substantiality requirement is met.  See R.I. Fishermen's All., Inc., 585 F.3d at 51 (finding the "substantiality" prong of Grable to be satisfied because "[t]here is a significant federal interest in making certain that states comply with federally sanctioned interstate compacts" even though the claim involved one specific compact).

**d.**

The fourth Grable requirement is satisfied if we may "entertain [the issue] without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.  We conclude that this requirement also is met.

As we have explained, City of Chicago establishes that, if the federal issue arises here in a claim that is not materially distinguishable from the federal claims in City of Chicago, then the issue arises here pursuant to a claim that was properly removed under § 1441(a) based on § 1331.  After all, City of Chicago makes clear that the federal claims there were properly removed to

federal court under § 1441(a) based on § 1331. So, if the claim that presents the stated federal issue here is like the federal claims there, then we would have reason to be confident that federal-court resolution of the issue would not upset the federal-state balance, as we see no basis for concluding that in setting forth this fourth requirement Grable intended to call the § 1331 holding in City of Chicago into question.

We do note, however, that the precise basis for the Court's § 1331 ruling in City of Chicago is not entirely clear. City of Chicago does establish that claims that seek review of a state (or local) administrative ruling under a state law permitting such review suffice to make the actions alleging those claims "civil actions" under § 1441(a) when the claims (1) arise under federal law within the meaning of 28 U.S.C. § 1331 and (2) are no more dependent on the state administrative record than were the federal claims in City of Chicago. See 522 U.S. at 165-66. But it is not entirely clear whether the Court in City of Chicago concluded that § 1331 encompassed the federal claims there in part because the claims were not dependent on the administrative record or whether the Court instead considered the federal claims' potential dependency on the administrative record to be relevant only to the determination of whether § 1441(a) encompassed them.[6]

---

[6] The uncertainty arises because the Court in City of Chicago at times addresses the dependency of the federal claims on the

- 29 -

We need not resolve the mystery here, however. As we have explained, the first three requirements of the Grable test are all satisfied as to the federal issue that is said to make RITC's challenge to the Board's ruling dismissing the Freightliner Claim a federal claim. Thus, given City of Chicago, we see no basis for concluding that Grable's fourth requirement precludes that claim from being a federal claim insofar as the claim is no more dependent on the state administrative record than City of Chicago deemed the relevant claims there to be. And we conclude that RITC's claim seeking review of the Board's dismissal of the Freightliner Claim is a claim that is just as independent of the administrative record as were the federal claims in City of Chicago.

In that regard, RITC's claim challenging the Board's dismissal of the Freightliner Claim does not take issue with any fact-finding by the Board. Rather, it alleges that the Board made an error of federal constitutional law when the Board concluded that the out-of-state application of the Dealer Law would categorically violate the Dormant Commerce Clause seemingly for reasons independent of any disputed fact.

---

administrative record in explaining why the claims give rise to "civil action[s]" for purposes of 1441(a), see 522 U.S. at 166, while at another point addresses the federal claims' dependency on the administrative record in explaining why they fall within § 1331, see id. at 167.

- 30 -

To be sure, the Board necessarily applied its conclusions of constitutional law, even if cursorily, to the <u>fact</u> that ATG Raynham was located in Massachusetts. But in <u>City of Chicago</u> itself the Court took as a given the state of the facts found by the state agency, at least as to the federal claims that the Court held were within the Court's subject-matter jurisdiction. <u>See</u> <u>id.</u> at 164-66. We thus conclude that the RITC claim in question meets <u>Grable</u>'s fourth requirement.

**2.**

In sum, <u>City of Chicago</u> held that there was subject-matter jurisdiction under § 1331 and § 1441(a) over the federal claims there, and we conclude that RITC's claim challenging the Board's dismissal of the Freightliner Claim is just like those claims in all the ways that matter for present purposes. Thus, we conclude that this RITC claim falls within our subject-matter jurisdiction under § 1331 and § 1441(a) together.

**3.**

In light of our conclusion that there is subject-matter jurisdiction over RITC's claim challenging the Board's ruling dismissing the Freightliner Claim, we also conclude -- reviewing de novo, <u>see</u> <u>Law Offs. of David Efron</u>, 782 F.3d at 51 -- that there is subject-matter jurisdiction pursuant to 28 U.S.C. § 1367(a) over RITC'S claim challenging the Board's dismissal of the Western Star Claim. And that is so even assuming that this RITC claim

does not itself mirror any of the federal claims in City of Chicago, see 522 U.S. at 165 (quoting 28 U.S.C. § 1367(a)).

This conclusion follows from the fact that 28 U.S.C. § 1367, in granting supplemental jurisdiction, is not keyed to whether the claim asserted to be encompassed by it suffices to make the action bringing the claim a "civil action." Rather, that provision states only that, once there is a "civil action of which the district courts have original jurisdiction," then "the district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

True, both RITC's claim challenging the Board's dismissal of the Western Star Claim and RITC's claim challenging the Board's dismissal of the Freightliner Claim "[must] 'derive from a common nucleus of operative fact'" for there to be supplemental jurisdiction over RITC's claim challenging the Board's dismissal of the Western Star Claim. City of Chicago, 522 U.S. at 165 (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966)). But we see no basis for concluding that the two claims do not.

In City of Chicago, the Court concluded that the requirements for supplemental jurisdiction were met because the

state and federal claims that the plaintiff presented to the Court all derived from the plaintiff's "unsuccessful efforts to obtain demolition permits from the [state agency]." Id. Here, RITC's claim challenging the Board's dismissal of the Freightliner Claim and RITC's claim challenging the Board's dismissal of the Western Star Claim are, similarly, derived from RITC's unsuccessful effort to obtain from the Board an adjudication on the merits of the claims that RITC presented to the Board. Indeed, the Board's dismissal ruling pertained to the entirety of RITC's protest concerning Daimler's alleged violations of the Dealer Law, which were all brought in the same Board proceeding. Thus, we are satisfied that there is supplemental jurisdiction over RITC's claim challenging the Board's dismissal of the Western Star Claim, regardless of whether there is also another basis for a federal court to have subject-matter jurisdiction over that claim.[7]

**III.**

At last, then, we reach the merits of RITC's challenge to the District Court's summary-judgment ruling. We review the

_____

[7] In light of our conclusions that we have subject-matter jurisdiction under City of Chicago over both of RITC's claims in federal court, we leave for another day the question of whether a state-law-based claim seeking review of a state or local administrative agency's ruling pursuant to state law that is materially distinguishable from the federal claims at issue in City of Chicago would be, under Armistead, precluded from falling within a federal court's subject-matter jurisdiction, notwithstanding City of Chicago.

- 33 -

District Court's "grant of summary judgment [to Daimler] de novo. In conducting this review, we assess the facts in the light most flattering to the nonmovant and draw all reasonable inferences on its behalf." Phila. Indem. Ins. Co. v. BAS Holding Corp., 78 F.4th 53, 58 (1st Cir. 2023) (citations omitted). A "party is entitled to summary judgment only when the record reveals no genuine issue as to any material fact and it is clear that judgment is proper as a matter of law." Id. (citation omitted). We begin with the claim in which RITC seeks to overturn the Board's dismissal of the Freightliner Claim.

**A.**

Despite the fact that RITC can prevail on the claim only if the Dormant Commerce Clause issue is resolved, "prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." Buchanan v. Maine, 469 F.3d 158, 172 (1st Cir. 2006) (quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981)). And, as both the Board's and the District Court's decisions make clear, the constitutional issues pertaining to the Dormant Commerce Clause and the state statutory issues pertaining to the Dealer Law's application to Daimler's out-of-state establishment of ATG Raynham are not easily disentangled. Indeed, both the Board and the District Court appeared to rule against RITC not only on constitutional grounds but also on state statutory ones.

Neither party disputes that there is potentially an issue of state statutory construction antecedent to the questions concerning the Dormant Commerce Clause on which the parties chiefly focus in their briefing. That question of state statutory construction is: Can RITC's alleged notice- and good-cause-based violations by Daimler be predicated on Daimler's establishment of the ATG Raynham dealership outside of Rhode Island? After all, RITC and Daimler each recognize that if the answer to that question is "no," because the "relevant market area" as it appears in § 31-5.1-4.2(a) of the Dealer Law cannot encompass an area beyond Rhode Island's borders, then there would be no state-law basis for RITC's requested relief from the Board. And, in that case, there then would be no need for us to reach the question of whether the Dormant Commerce Clause would bar such relief, as that state-law ground in and of itself would suffice to warrant our upholding the District Court's ruling granting summary judgment to Daimler on RITC's claim concerning the Board's dismissal of the Freightliner Claim.

Thus, before addressing the merits of the District Court's determination that the Board did not err in ruling on the Dormant Commerce Clause issue, we first need to address how the antecedent state-law question about the scope of the "relevant market area" in the Dealer Law bears on the way that we should

- 35 -

exercise our subject-matter jurisdiction.[8]  We turn, then, to that

issue, which raises some complicated questions of its own about

the role of a federal court in adjudicating a dispute of this sort.

**1.**

For starters, RITC argues that, under Burford v. Sun Oil

Co., 319 U.S. 315 (1943), we should abstain from deciding the

antecedent state-law question that we have identified, at least

insofar as we would resolve it by ruling against RITC on the ground

that the Dealer Law "only applies within Rhode Island."  RITC

contends that abstention in that circumstance would be proper to

avoid "needless friction with state policies," given that such a

ruling would limit the reach of the Dealer Law as a matter of state

statutory construction.  We do not agree.

---

[8] Insofar as Daimler is suggesting that there is a distinct
antecedent state-law question concerning the Board's statutory
authority to exercise jurisdiction over a "protest" that seeks
relief that would transgress federal constitutional limits, and
that we must defer to the Board's determination that the Board
does lack such jurisdiction, we cannot agree that such a question
could obviate the need to address the federal constitutional issues
concerning the Dormant Commerce Clause.  We see no basis for
concluding that the Board has discretion to decline to exercise
jurisdiction based on a legally erroneous determination about the
limits that the federal Constitution imposes.  We note that there
may be other state-law grounds on which it may be possible to
conclude that the Dealer Law does not permit any of RITC's
requested relief, but none has been raised to us by the parties or
was addressed (at least in any clear way) by either the Board or
the District Court.  We thus do not treat any such state-law issues
as being before us here.

We have previously explained that there is no reason for us to abstain under Burford if the "plaintiffs do not seek individualized review of fact- (or cost-) specific regulatory decision making." Bath Mem'l Hosp. v. Me. Health Care Fin. Comm'n, 853 F.2d 1007, 1014 (1st Cir. 1988); see also Forty Six Hundred LLC v. Cadence Educ., LLC, 15 F.4th 70, 75 (1st Cir. 2021) ("Burford abstention applies only in 'unusual circumstances,' where the federal court risks usurping the state's role as the 'regulatory decision-making center.'" (quoting Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 474 (1st Cir. 2009))). And here, the review that RITC seeks is not of that kind that merits Burford abstention, because the antecedent state-law question is significantly less technical and less party-specific than the kind involved in Burford, as it is a purely legal one concerning the meaning of "relevant market area."

**2.**

Burford abstention aside, there remains a question as to whether we should resolve the state-law question in play by ourselves or instead certify it to the Rhode Island Supreme Court. Cf. Turner v. City of Boston, 760 F. Supp. 2d 208, 214 (D. Mass. 2011) ("[C]ertification is now more appropriate than abstention, which would require institution of a new action in the state courts."); Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 79 (1997) (describing certification as a cheaper, faster, and simpler

- 37 -

alternative to abstention); Rogers v. Okin, 738 F.2d 1, 5 (1st Cir. 1984) ("In general, certification serves as a substitute for, not a complement to, abstention."); Phillips v. Equity Residential Mgmt., LLC, 844 F.3d 1, 7 (1st Cir. 2016) (noting that certification in a case involving "interpretation of a state statute governing an area of traditional state authority. . . . 'promotes "strong federalism interests"'" (quoting Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 53 (1st Cir. 2013))). We conclude that certification is the proper course, notwithstanding the rulings below by the District Court and the Board appearing to hold that, as a matter of state law, the "relevant market area" does not encompass any area that is outside of Rhode Island.

**a.**

Article I, Rule 6(a) of the Rhode Island Supreme Court Rules of Appellate Procedure provides that the Rhode Island Supreme Court may "answer questions of law certified to it by . . . a Court of Appeals of the United States . . . when requested by the certifying court." Two conditions, however, must be met.

The first condition is that the certified question "may be determinative of the cause then pending in the certifying court." Id. The second condition is that there must be "no controlling precedent in the decisions of the Supreme Court." Id.

For reasons that we have already explained, the state-law issue may be determinative here. Thus, the first condition is met. In addition, as the parties appear to agree, there is no Rhode Island Supreme Court precedent on this issue. So, the second condition is met as well.

We do have our own limits, however, on when we may certify a question of state law. Specifically, because of our own obligations to exercise the jurisdiction that we have, we will not certify a question of state law to a state's highest court if the answer to that question is "sufficiently clear to allow us to predict [the Rhode Island Supreme Court's] course." Hosp. San Antonio, Inc. v. Oquendo-Lorenzo, 47 F.4th 1, 6 (1st Cir. 2022) (quoting Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 18 (1st Cir. 2012)). We thus must decide if that limit bars certification here, which we will next address.

**b.**

RITC argues that it is perfectly clear that, as a matter of state law, "relevant market area" must be construed to require § 31-5.1-4.2(a) to be applicable even to a dealership outside Rhode Island's borders. RITC points out that the term "relevant market area" is defined by § 31-5.1-1(13) merely as "the area within a radius of twenty (20) miles around an existing dealer or the area of responsibility defined in the franchise, whichever is greater." Thus, RITC emphasizes that this definition, by its terms, contains

no bar to "relevant market area" encompassing an area outside Rhode Island.[9]

In addition, RITC asserts -- correctly -- that there is no precedent from any Rhode Island state court or our Court reading "relevant market area" to contain an implicit Rhode-Island-only limitation. RITC acknowledges in so contending that we have previously addressed the extraterritorial reach of Rhode Island's Dealer Law in Fireside Nissan, 30 F.3d 206. But RITC is right that Fireside Nissan does not hold that the relevant provisions of the Dealer Law -- for present purposes -- have no application beyond Rhode Island as a matter of state law.

Fireside Nissan held that the Dealer Law did not permit an out-of-state dealership to protest to the Board based on a dealership having been established in Rhode Island. See 30 F.3d at 209-13; see also BMW Stores, 860 F.2d at 215 (holding that Kentucky's dealer-protection statute did not permit an Ohio dealer to protest the establishment of a Kentucky dealership). The question here, though, is whether an in-state dealership may protest to the Board about a violation of the Dealer Law based on

---

[9] Section 31-5.1-1(13) requires the radius defining a "relevant market area" to begin from an "existing dealer," and, as RITC points out, § 31-1-19 limits the definition of "dealer" to those who have "an established place of business . . . in [Rhode Island]." But there is no dispute that RITC is a "dealer" that has a "relevant market area" surrounding it.

a dealership having been established <u>outside of Rhode Island</u>. <u>Fireside Nissan</u> had no occasion to address <u>that</u> question.

RITC also is right that <u>County Motors, Inc.</u> v. <u>General Motors Corp.</u>, No. 00-108T, 2001 WL 34136693 (D.R.I. Jan. 29, 2001), does not require us to reject RITC's broad reading of "relevant market area." There, an in-state dealership had brought a protest to the Board under the Dealer Law about the relocation of a dealership from one out-of-state-location to another, and the Board had dismissed the protest on the ground that it lacked jurisdiction over the relocation of an automobile dealership that had occurred out of state. See <u>id.</u> at *1. The in-state dealership then brought a separate civil suit in federal court -- rather than an appeal of the Board's decision -- in which it sought to enforce the Dealer Law against the manufacturer based on its having made the out-of-state relocation of the out-of-state dealership. <u>Id.</u> The U.S. District Court for Rhode Island dismissed the claim, in part on the ground that "[t]o allow [the in-state dealership] to protest the relocation of [the out-of-state dealership] under this same statute would clearly be inequitable and contrary to the reasoning of <u>Fireside Nissan</u>." <u>Id.</u> at *3.

In addition to the fact that we are not bound by a district court ruling, RITC correctly points out that, as we have explained, <u>Fireside Nissan</u> simply did not decide whether an in-state dealership may enforce the relevant requirements of the

Dealer Law based on a dealership having been established out of state.  Thus, County Motors, aside from lacking controlling force, fails to provide a persuasive ground for holding that the "relevant market area" referred to in the Dealer Law does not, as a matter of state law, encompass any out-of-state area.

That said, because "the highest court [of Rhode Island] has not spoken directly on the question [of state law] at issue," we still must "predict 'how that court likely would decide the issue.'" Barton v. Clancy, 632 F.3d 9, 17 (1st Cir. 2011) (quoting González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318-19 (1st Cir. 2009)).  And, we conclude that, notwithstanding the reasons that RITC gives for concluding otherwise, Rhode Island law is not "sufficiently clear to allow" us to do so.  Hosp. San Antonio, Inc., 47 F.4th at 6 (quoting Pagán-Colón, 697 F.3d at 18).

### c.

Fireside Nissan based its holding that an out-of-state dealer could not bring a protest to the Board under the Dealer Law in part on the fact that, even though the Dealer Law makes express that it applies to out-of-state manufacturers, it contains no similarly express language that it applies to out-of-state dealerships. See Fireside Nissan, 30 F.3d at 213-14 ("Unlike the definition of 'new motor vehicle dealer' which includes generally 'any person' . . . the definition of 'manufacturer' specifically

includes any person, 'resident or nonresident[.]' . . . . Thus, the Rhode Island legislature has clearly expressed an intent to regulate out-of-state manufacturers . . . . No such expression exists with regard to out-of-state dealers . . . ."). That textual distinction provides some support, in our view, for reading "relevant market area" not to reach the out-of-state franchise at issue in the Freightliner Claim.

Indeed, while "relevant market area" is defined seemingly without regard to state borders, R.I. Gen. Laws § 31-5.1-1(13), the Dealer Law uses the similarly open-ended phrase "any person" to define "manufacturer," id. § 31-5.1-1(8), and "new motor vehicle dealer," id. § 31-5.1-1(11). Yet, Fireside Nissan deemed significant in barring a protest by an out-of-state dealership the fact that the legislature made a point of expressly elaborating that the phrase "any person" in the definition of "manufacturer" includes "nonresident[s]." 30 F.3d at 213-14; see also R.I. Gen. Laws § 31-5.1-1(8). Fireside Nissan relied on that fact to read the phrase "any person" in the Dealer Law's definition of "new motor vehicle dealer," which did not include a similar express elaboration, R.I. Gen. Laws § 31-5.1-1(11), not to encompass an out-of-state dealership, see 30 F.3d at 213-14. Thus, there is reason to wonder whether the legislature, by not including any similarly express statement that a "relevant market area" can extend beyond Rhode Island's borders (such as, for example, a

phrase saying, "whether inside Rhode Island or not"), intended for the "relevant market area" to extend no farther than Rhode Island's borders. Cf. Abel v. Plan. & Zoning Comm'n of Town of New Canaan, 998 A.2d 1149, 1160 (Conn. 2010) (explaining that even though some Connecticut statutes do "not regulate conduct outside the state[,]" such that "there is no presumption that the statute does not apply to persons outside the state[,]" "[n]evertheless, because the phrase 'any person' is ubiquitous in [Connecticut's] statutes . . . [the court could not] conclude that the [Connecticut] legislature intends, in every instance in which it uses the phrase, to encompass persons outside the territorial jurisdiction of [Connecticut]"); see also Dur-Ite Co. v. Indus. Comm'n, 68 N.E.2d 717, 722 (Ill. 1946) ("A statute is prima facie operative only as to persons or things within the territorial jurisdiction of the law-making power which enacted it. These rules apply to statutes using general words, such as 'any' and 'all,' in describing the persons or acts to which the statute applies" (quoting 50 Am. Jur. Statutes § 487)).[10]

_____

[10] RITC does argue that the Dealer Law provides for jurisdiction only over persons who engage "directly or indirectly in purposeful contacts within [Rhode Island] in connection with the offering or advertising for sale of, or has business dealings with respect to, a motor vehicle[,]" R.I. Gen. Laws § 31-5.1-2, and that the Dealer Law "only regulates manufacturers who grant Rhode Island franchises."  But as we said in Fireside Nissan, "[t]his provision is not a general grant of extraterritoriality but rather an affirmation that parties who are covered by the various substantive provisions in [the Dealer Law] . . . cannot

We recognize that RITC contends that there is no presumption against extraterritorial application in Rhode Island law. But, insofar as there is a basis for concluding that there is an implicit ambiguity in the definition of "relevant market area" concerning its out-of-state reach, there is certainly no presumption for extraterritorial application under Rhode Island law. In consequence, statutory provisions that do not on their face apply out of state may simply contain an ambiguity concerning their extraterritorial application that may be resolved only by considering the specific measure at issue in light of its structure and purposes. And that being so, we cannot say that the District Court's purpose-based reading of the Dealer Law not to reach out of state to encompass the establishment of ATG Raynham in Massachusetts is, after Fireside Nissan, without some force.

We note, too, that other circuits have construed statutes like the Dealer Law not to apply in the extraterritorial manner that RITC needs for it to apply to succeed on its Freightliner Claim. For example, in Carolina Trucks & Equipment, Inc., 492 F.3d at 488, the Fourth Circuit addressed the scope of South Carolina's version of the Dealer Law, which prohibited "a manufacturer or franchisor" from "sell[ing], . . . directly or indirectly, a motor vehicle to a consumer in this State, except

escape enforcement of those provisions by claiming they are nonresidents." 30 F.3d at 213.

- 45 -

through a new motor vehicle dealer holding a franchise for the line make that includes the motor vehicle," S.C. Code Ann. § 56-15-45(D). The court reasoned that there was an ambiguity as to whether the phrase "in this State" modified the term "consumer," such that the provision covered sales to any "South Carolina consumers" regardless of the consumers' locations during the sales, 492 F.3d at 488-89, or whether "in this State" referred to the "entire sales transaction," such that the provision covered only sales occurring within South Carolina, id. at 489. The court then embraced the latter construction, applying a presumption against extraterritoriality and a canon of constitutional avoidance to read the South Carolina statute to have "no application to transactions in which South Carolina consumers travel outside the state to purchase trucks." Id. at 489-90, 493-94.

The Seventh Circuit has taken a similar approach in construing the extraterritorial scope of a general dealer-protection statute in Wisconsin. See Morley-Murphy Co., 142 F.3d at 380. There, the statutory provision at issue stipulated that "[n]o grantor . . . may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause," and the appeal had concerned a manufacturer's choice not to renew a distributorship agreement with a Wisconsin-incorporated distributor that had

dealerships in Wisconsin as well as in other states.  Id. at 374-75.  The court, in addressing whether the distributor could be awarded damages for "lost profits arising out of the [manufacturer's] termination of [the distributor's] out-of-state dealerships" in violation of the statute, concluded that the statute did not "reach[] beyond Wisconsin's borders . . . to . . . sales of . . . products in Minnesota and Iowa."  Id. at 380.

In so concluding, the court noted that the statute was "silent on the question of its extraterritorial reach."  Id. at 378.  And the court then predicted that, given this silence, the Wisconsin Supreme Court would apply a presumption against extraterritoriality to avoid "significant questions" regarding the Dormant Commerce Clause.  Id. at 378-80.  Thus, the court held that the statute did not permit the recovery of profits "attributable to the termination of [the distributor's] right to serve states other than Wisconsin."  Id. at 381.

That is not to say these authorities demonstrate with clarity what the Rhode Island Supreme Court would do.  The language of the measures in question in those cases is not identical to the relevant language of the Dealer Law and is arguably less susceptible of a narrowing construction.  We also are not aware of a Rhode Island Supreme Court decision applying a presumption against extraterritoriality, such as the Fourth and Seventh Circuits applied in the precedents described above.

But, in addition to the reasons to be uncertain that the Rhode Island Supreme Court would construe "relevant market area" to encompass an area beyond Rhode Island's borders that we have set forth above, we note that the Rhode Island Supreme Court does recognize a canon of constitutional avoidance. See Hometown Props., Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996) (invoking the canon of constitutional avoidance when a federal constitutional-law issue was raised); see also Pontbriand v. Sundlun, 699 A.2d 856, 866 (R.I. 1997) (explaining that the Rhode Island Supreme Court "shall favor that [interpretation] which presents no potential constitutional difficulties" (emphasis added)). Thus, that canon may provide a basis for construing the measure here narrowly to not reach the out-of-state conduct at issue, even if a presumption against extraterritoriality would not.

At the same time, while the District Court appeared to conclude that the Dormant Commerce Clause issues were clear-cut, and thus supported a reading of the Dealer Law here that would not reach beyond Rhode Island's borders, we are less confident the Rhode Island Supreme Court would conclude the same. That is in part because of the mix of in-state and out-of-state conduct that is the subject of the ruling by the Board that is the claim's focus. But it is also in part because of the nature of the relief being sought, which includes not only equitable relief seeking

- 48 -

"remov[al]" of the dealership Daimler established in Massachusetts but also (less ambitiously) merely damages for Daimler's failure to notify RITC of that dealership's establishment. Compare Healy, 491 U.S. at 337 ("[T]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another."), with IMS Health Inc. v. Mills, 616 F.3d 7, 30 (1st Cir. 2010) (citing CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 88-89 (1987)) (discussing import of an out-of-state entity's "strong in-state nexus" to the Dormant Commerce Clause inquiry), abrogated on other grounds by Sorrell v. IMS Health Inc., 564 U.S. 552 (2011). And, finally, it is in part because of our uncertainty about whether the Rhode Island Supreme Court would perceive there to be an ambiguity in the relevant state statutory provision at all, given that the definition of "relevant market area" on its face contains no bar to the "area" extending outside Rhode Island.[11]

---

[11] Insofar as Daimler argues both that the Board determined that the "relevant market area" is not limited to Rhode Island itself and that we owe deference to this construction of the Dealer Law, we are not persuaded that this argument provides a sufficient basis for our declining to certify the question at hand to the Rhode Island Supreme Court. Even on such an understanding of the Board's ruling, and even accepting that the Board's constructions of the Dealer Law are generally entitled to deference, the question would remain as to whether the Rhode Island Supreme Court would agree that this specific construction by the Board would be entitled to deference, given all the reasons identified above for concluding -- as the District Court did -- that no such extraterritorial reach was intended. Cf. Mancini v. City of Providence, 155 A.3d 159, 167-68 (R.I. 2017) (noting that if "a

For these reasons, we conclude that it is prudent to certify the question of state law that is at issue to the Rhode Island Supreme Court. Cf. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 92 (1st Cir. 2023) ("While we would generally look to the text of the statute, intent of the legislature, and case law to address these issues, our de novo examination of the statutory scheme and the lack of precedent available to guide our analysis leads us to conclude that the best course to resolve these questions is to certify this issue."). Indeed, RITC itself argues that it would be better for a state court as opposed to a federal court to "read a limitation into a Rhode Island statute that does not exist in the statutory language, or presume that a Rhode Island statute does not apply extraterritorially where current Rhode Island law does not contain that presumption[.]" Accordingly, before addressing the merits of RITC's challenge to the District Court's grant of summary judgment on RITC's Freightliner-Claim-related

---

statute's requirements are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized" and that, regardless of "deference due, this Court always has the final say in construing a statute," given that the "true measure of a court's willingness to defer to an agency's interpretation of a statute depends, in the last analysis, on the persuasiveness of the interpretation, given all the attendant circumstances" (emphasis added) (internal quotations omitted) (first quoting Duffy v. Powell, 18 A.3d 487, 490 (R.I. 2011); then quoting In re Proposed Town of New Shoreham Project, 25 A.3d 482, 506 (R.I. 2011); and then quoting Unistrut Corp. v. State of R.I. Dep't of Lab. & Training, 922 A.2d 93, 101 (R.I. 2007))).

challenge to the Board's ruling, we certify to the Rhode Island Supreme Court the following question:

> 1. Can a "relevant market area" in Rhode Island General Laws section 31-5.1-4.2(a) extend beyond Rhode Island's borders?

## B.

There remains to address RITC's challenge to the District Court's grant of summary judgment on the claim in which RITC seeks review of the Board's ruling dismissing the Western Star Claim.  If we were to affirm the District Court's grant of summary judgment on RITC's claim challenging the Board's dismissal of the Freightliner Claim (for whatever reason), then we might not need to address the merits of RITC's claim challenging the Board's dismissal of the Western Star Claim.  See 28 U.S.C. § 1367(c)(3) (explaining that "district courts may decline to exercise supplemental jurisdiction over a claim" that it would have had supplemental jurisdiction over if "the district court has dismissed all claims over which it has original jurisdiction").  But, because it is evident on the record as it now stands that we have no basis for disturbing the aspect of the District Court's summary-judgment ruling that dismissed the Western Star Claim, we conclude that it would further "the interests of fairness, judicial economy, convenience, and comity" to address the merits of the RITC's claim challenging the Board's dismissal of the Western Star Claim.  Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

RITC does assert on appeal that the District Court misunderstood the claim because the District Court failed to appreciate that the "claim does not involve any [Daimler] conduct occurring outside Rhode Island, and therefore stands independently of RITC's protest of the new Freightliner dealership." In support of this argument, RITC notes that its Western Star Claim to the Board was based on the simple fact that Daimler, "without any basis, denied RITC's application for a Western Star franchise." Moreover, RITC contends that the "refusal of [Daimler] to grant RITC a Western Star franchise in Rhode Island does not involve an extraterritorial application of Rhode Island law." RITC then appears to argue that although it never claimed to the Board that any of Daimler's out-of-state conduct was "arbitrary, in bad faith, or unconscionable" -- and instead claimed only that Daimler's wholly in-state conduct was -- the District Court wrongly assumed the contrary.

The District Court made no such mistaken assumption, however. In affirming the Board's dismissal ruling, the District Court explained that RITC's Western Star Claim to the Board concerned a miscommunication between RITC and Daimler -- two "entities to which the Dealer Law applies." R.I. Truck Ctr., 642 F. Supp. 3d at 222. The District Court then stated, "If there were no other facts, this case would be straightforward. The Board can clearly adjudicate the in-state conduct of entities that the

Dealer Law covers." Id. Thus, the District Court did acknowledge that the conduct that RITC claimed was in violation of the Dealer Law was "in-state conduct." Id. The District Court nevertheless pointed out what it understood to be a problem: "[T]hese interactions directly related to conduct that took place outside the state" and "directly affected out-of-state conduct[.]" Id. And the District Court concluded that RITC's requested relief as to its Western Star Claim to the Board would "have the effect of extraterritorially regulating conduct in Massachusetts" in a way that violated the Dormant Commerce Clause. Id. (emphasis in original).

In other words, the District Court concluded that, even if the conduct at issue violated the Dealer Law, the Board's enforcement of the Western Star Claim would nevertheless violate the Dormant Commerce Clause. At no point, however, does RITC attempt to rebut the District Court's predicate determination that Daimler's denial of the Western Star franchise to RITC "directly related to conduct that took place outside the state" and "directly affected out-of-state conduct," id., even though the activity that RITC alleged was in violation of the Dealer Law was itself wholly in-state conduct. And it was that predicate determination on which the District Court rested its conclusion that the relief requested from the Board as to the Western Star Claim would violate the Dormant Commerce Clause. Thus, we see no basis for deeming the

- 53 -

District Court to have erred in granting summary judgment to Daimler on its claim seeking review of the Board's dismissal of the Western Star Claim.[12]

**IV.**

The District Court's ruling as to RITC's claim challenging the Board's dismissal of the Western Star Claim is **affirmed**. As to RITC's claim challenging the Board's dismissal of the Freightliner Claim, we direct the clerk of this Court to forward to the Rhode Island Supreme Court, under official seal, this decision, a copy of the certified question, a copy of the parties' briefs and appendix, and a copy of the notice of removal and attachments thereto.

We retain jurisdiction and wait until we receive guidance from the Rhode Island Supreme Court before we proceed

---

[12] RITC does argue in its reply brief that its "claim regarding the Western Star franchise would still be viable absent the appointment of the Massachusetts dealer[, ATG Raynham]." RITC argues in that regard that Daimler acted in bad faith merely because (1) RITC "operated a successful Freightliner dealer that met or exceeded sales targets," yet Daimler denied RITC the Western Star franchise anyway, and (2) Daimler's explanation to RITC that a lack of service capacity was the reason for the denial was dishonest. Indeed, the argument runs, "[a]lthough RITC believes that one of the reasons [Daimler] denied RITC the Western Star franchise was due to [Daimler's] surreptitious plans to award the franchise to the Massachusetts dealer, RITC has not alleged that its suspicions constitute the only possible reason." But this argument for overturning the District Court's ruling is waived because "[a]rguments raised for the first time in a reply brief are waived." United States v. Vanvliet, 542 F.3d 259, 265 n.3 (1st Cir. 2008).

- 54 -

further with RITC's claim challenging the Board's dismissal of the Freightliner Claim.  No costs shall be awarded at this time.